UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS | ) | |
| BOARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 1:10-CV-346 JD |
| v. | ) | |
| | ) | |
| IRVING READY-MIX INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

On October 5, 2010, Plaintiff, Rik Lineback ("Director"), Regional Director of the

Twenty-Fifth Region of the National Labor Relations Board ("Board"), filed a motion for

injunctive relief on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations

Act ("Act") and a memorandum in support. [DE 1 and DE 2]. In the motion, the Director seeks

temporary injunctive relief prior to the Board's ruling in a pending administrative action.

Subsequently, both parties were granted leave to file briefs in excess of twenty-five pages. On

October 22, 2010, the Director filed its supplemental memorandum in support of its motion for

injunctive relief. [DE 16]. On November 3, 2010, the Defendant, Irving Ready Mix Inc.

("Irving"), filed a supplemental response in opposition. [DE 23]. The Director did not file a

reply in support of its motion.

The Director asked the Court to decide the motion for injunctive relief on the

administrative record alone and without a hearing. [DE 3]. On October 20, 2010, Irving filed a

response indicating that it reserved the right to file a motion for a hearing on the motion for

injunctive relief.  On November 3, 2010, Irving filed a motion for hearing. [DE 23].  The Director did not file a response in opposition to Irving's motion for a hearing.

On November 9, 2010, the Court granted a motion, filed by the Chauffeurs, Teamsters and Helpers Local Union No. 414 ("Union"), to appear *amicus curiae*.  On November 22, 2010, the Union filed an *amicus* brief in support of the Director's request for injunctive relief.  [DE 26].  On November 29, 2010, Irving filed a response.  [DE 29].  On December 7, 2010, the Union filed a reply.  [DE 30].

On December 17, 2010, the ALJ issued an opinion agreeing with all but one of the Director's alleged violations of the Act.  [DE 31-2].   The contents of this order are discussed in greater detail below.   On December 29, 2010, the Director filed a notice with this Court, noting the conclusions in the ALJ's opinion and repeating the Director's request for Section 10(j) injunctive relief, [1] with the singular exception, consistent with the ALJ's opinion, that the

---

[1] Because the ALJ decision is neither final nor self-enforcing, the availability of Section 10(j) injunctive relief continues until the Board issues its final order in the underlying administrative  action. *Sharp ex rel. N.L.R.B. v. Webco Industries, Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000) (holding employer's argument that ALJ's decision obviated the need for interim relief to be meritless). *See also Overstreet v. El Paso Elec. Co.*, 176 Fed.Appx. 607, 609 (5th Cir. 2006) (unpublished decision) (holding that 10(j) temporary injunctive relief may be properly sought, pending the Board's consideration of ALJ's decision).

Once a complaint is filed, an ALJ holds a hearing on the complaint and prepares a decision containing findings of fact, conclusions, and recommendations as to the disposition of the case. *Overstreet v. El Paso Disposal, L.P.*, 668 F.Supp.2d 988, 998 (W.D.Tex. 2009)(citing 29 C.F.R. §§ 102.35, 102.45). The ALJ's decision, however, is not enforceable. *Id.* (citing 29 C.F.R. § 102.45); *Pate v. McKesson HBOC, Inc.*, 32 Fed.Appx. 861, 862 (9th Cir. 2002)(unpublished opinion)(noting that ALJ's decision is not final until reviewed by the Board).  Instead, only the Board, after either adopting or rejecting the ALJ's decision, can effectuate relief. *El Paso Disposal, L.P.*, 668 F.Supp.2d at 998 (citing 29 C.F.R. § 102.48); *Schaub v. W. Mich. Plumbing & Heating Inc.*, 250 F.3d 962, 968 (6th Cir. 2001)("The ALJ's decision is only a recommendation, which requires the Board's resolution of the Union's exceptions to that decision.").  Further, following ruling by the Board, additional review of the Board's final order may be sought, thereafter, in a United States Court of Appeals. *Id.* (citing 29 U.S.C. § 160(f)).

As a result, the availability of Section 10(j) relief continues even after a ruling by the ALJ.  *Id.*; *Webco Industries, Inc.*, 225 F.3d at 1136; *Barker ex rel. N.L.R.B. v. Regal Health and Rehab Center, Inc.*, 632 F.Supp.2d 817, 833 (N.D.Ill. 2009) (rejecting employer's argument that section 10(j) relief was no longer necessary because the ALJ's opinion was currently being reviewed by the Board.  In so ruling the Court noted that the 2008 Annual Report of the NLRB revealed the median number of days from an ALJ's decision to the issuance of a Board decision to be 269.73); *Lineback v. Frye Elec., Inc.*,  539 F.Supp.2d 1111, 1118 -1119 (S.D.Ind. 2008) (ALJ's opinion issued one month before the filing of a motion for Section 10(j) injunctive relief with the District Court); *Moran v. LaFarge*

Director was no longer seeking injunctive relief in relation to the Director's claim of bad faith bargaining. [DE 31]. On January 7, 2011, Irving filed a response, repeating many of the same arguments raised in Irving's previous briefs and asserting that Irving intends to challenge the ALJ's decision by filing objections before the Board. [DE 32].

## I. Facts

### A. Irving's Business

Irving Ready-Mix Inc. is a corporation engaged in the delivery of ready-mix concrete and has places of business in Fort Wayne and Kendallville, Indiana. Trans. 13-14. Irving delivers ready-mix concrete via trucks equipped with a large drum that can carry up to eleven cubic yards of concrete. Trans. 13-14, 135.

---

*North America, Inc.*, 286 F.Supp.2d 1002, 1013 (N.D.Ind. 2003)(ALJ's decision issued several months after the filing of a petition for 10(j) relief but before a ruling on the petition by the District Court); *Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364 (2nd Cir. 2001)(ALJ's decision was issued five months after the filing of the Section 10(j) petition for injunctive relief and one-and-a-half months before the District Court's ruling on the petition). *See also Norelli v. HTH Corp.*, 699 F.Supp.2d 1176, 1205 (D.Haw. 2010)(noting that, once the District Court enters a § 10(j) injunction, the Board will expedite review of the ALJ's decision, pursuant to NLRB Rules & Regulations § 102.94).

Instead, a District Court, deciding whether to grant a petition for Section 10(j) injunctive relief, is advised to give deference to the opinions rendered by the ALJ, particularly in regards to the ALJ's findings in relation to the petitioner's likelihood of success on the merits. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502-03 (7th Cir. 2008).

> [T]he ALJ's decision . . is [] relevant to the propriety of section 10(j) relief. Assessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.

*Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 288, 300 -301 (7th Cir. 2001) (holding that the Director had a strong-likelihood of success on the merits, based, in large part, upon the ALJ's decision in favor of the Director). *See also Frye Elec., Inc.*, 539 F.Supp.2d at 1118 -1119; *Chavarry v. E.L.C. Electric, Inc.*, 2004 WL 2137644, at *5 (S.D.Ind. 2004); *Moran*, 286 F.Supp.2d at 1013 (noting, in addition, the Board's policy of not overruling an ALJ's credibility determinations absent a clear preponderance of the evidence to the contrary). *But see Overstreet v. United Broth. of Carpenters and Joiners of America, Local Union No. 1506*, 409 F.3d 1199, 1208 (9th Cir. 2005) (noting that the ALJ's decision "by no means foreordains the Board's decision" and that "it is not uncommon for the Board to overturn an ALJ decision that found in favor of the General Counsel").

Irving prepares ready-mix concrete for delivery at Irving's five batch plants. Trans. 14, 241. This process involves combining concrete powder, aggregate, water, and other materials into the mixer's drum. Trans. 13-14. Once loaded, the driver operates the drum via foot pedal located inside the truck's cab. Trans. 14, 132. Pushing the pedal one way causes the drum to rotate in a direction that mixes the ingredients. Trans. 132. Pushing the pedal the other way causes the drum to rotate in the opposite direction, which causes the discharge of the ready-mix concrete by way of a chute. Trans. 132. The driver monitors a slump meter located inside the truck's cab, which indicates the consistency of the mixture in the drum as it turns. Trans. 135-136. If the slump meter indicates that the load is too stiff, additional water can be added from the truck's internal water tank. Trans. 135-136. Once mixed, ready-mix concrete must be placed in the desired location within one-and-a-half to three hours, to maintain consistency and to avoid setting. Trans. 155, 346. In addition, once mixed, ready-mix concrete cannot be stored for later use. Trans. 347.

The ensure proper delivery of the concrete, Irving's drivers must carefully coordinate with others working at each job site. Trans. 144, 227. Effective coordination requires training and experience. Trans. 173-74, 203-04, 228. Upon arrival at a work site, Irving's drivers check in with the customer to determine the requirements of each, specific project. Trans. 138. Further, before pouring the concrete, Irving's drivers communicate with others at the job site to determine the necessary quantity and the proper placement. Trans. 140, 144. Thereafter, Irving's drivers work in unison with the workers at the site to regulate the rate and direction of discharge from the drum. Trans. 140-41, 144. Specifically, when pouring concrete, Irving's drivers regularly move the truck and adjust the direction of the chute to regulate the flow of

concrete. Trans. 141-43, 170, 196. Control over the speed and direction of the pour can be effectuated from inside the truck. Trans. 140-141. However, if a driver determines that it is easier to communicate with the workers or to see the location of the pour from the outside of the truck, the driver can also operate the chute from outside the truck. Trans. 164-65.

**B. The Parties' Negotiations**

On May 31, 2010, the date the parties' last collective bargaining agreement expired, Irving employed twenty-three Union drivers. Trans. 50. Irving does not dispute that the Union was the collective bargaining representative for Irving's drivers. *See* Director's Brief, DE 16 at 13. Indeed, since the late 1960s or early 1970s, Irving and the Union have been parties to successive collective bargaining agreements covering Irving's drivers. Trans. 63, 86. The parties most recent collective bargaining agreement was in effect from June 1, 2005 through May 31, 2010. Trans. 15-16, 63; Director's Ex. 2.

On March 4, 2010, in an effort to begin negotiations for a new collective bargaining agreement, the Union mailed a letter reminding Irving that the existing collective bargaining agreement was set to expire on May 31, 2010. Irving's Ex. 19. On April 27, 2010, Union President George Gerdes ("Gerdes") contacted Irving to schedule a negotiation meeting. Trans. 66-67; Director's Ex. 12. On May 17, 2010, the parties met for the first time to begin negotiations. Trans. 16, 67. At the meeting, the Union presented Irving with its proposal for a new collective bargaining agreement. Trans. 68; Director's Ex. 3. The parties briefly discussed the Union's proposals, and Irving did not raise any issues or concerns regarding the Union's proposal at the meeting. Trans. 68.

Two days later, on May 19, 2010, the parties met a second time. Trans. 16-17, 68-69. This time, however, Irving submitted a counter-proposal to the Union, suggesting amendments to the parties' existing collective bargaining agreement. Trans. 69-70, Director's Ex. 4. For example, Irving's proposal reduced Irving's retirement contribution and required drivers to contribute to their heath insurance premiums. Trans. 23-27; Director's Ex. 2 at 22; Director's Ex. 4; Director's Ex. 5. In addition, Irving's proposal increased the number of hours needed to qualify for vacation and retirement benefits and changed the calculation of overtime to include only those hours worked in excess of forty hours in a week. Trans. 20, 23-27; Director's Ex. 4. The Union responded by providing Irving with information regarding the Union's retirement plan and health insurance programs. Trans. 307-309; 380-383; Irving's Ex. 22; Director's Ex. 26. Failing to reach an agreement on the collective bargaining agreement, the parties agreed to meet again on May 24, 2010; one week before the expiration of the existing collective bargaining agreement. Trans. 70.

On May 24, 2010, a few hours prior to the scheduled meeting, attorney Scott Hall, counsel for Irving, contacted Gerdes by phone and advised Gerdes that Irving was not prepared to negotiate. Trans. 70-71. After noting the approaching deadline, Gerdes agreed to reschedule the meeting for May 28, 2010. Trans. 71-72. In the interim, on May 25, 2010, Irving's owners met to determine what financial package it would be willing to offer in the negotiations. Trans. 314-318. At the meeting, the owners decided that Irving could afford a financial package with a total cost of approximately $31.00 per hour per driver; a reduction of approximately $12.00 from the existing collective bargaining agreement. Trans. 254-255, 314-318; Director's Ex. 25; Irving's Ex. 12. Irving then drafted two proposals for presentation at the May 28, 2010

bargaining session, each designed to meet this cost point. Trans. 318-19; Director's Ex. 6; Director's Ex. 7.

On Friday, May 28, 2010, the parties met for a third and final bargaining session. Trans. 73. At the meeting, Irving presented the Union with its two proposals, labeled "Proposal A" and "Proposal B." Trans. 74, 319, Director's Ex. 6; Director's Ex. 7. Proposal A retained the drivers' current rate of pay but substantially reduced the drivers' benefits. Director's Ex. 6. Proposal B reduced the drivers' hourly rate of pay to $18.00 an hour, from $20.82 an hour, but made fewer changes to the drivers' benefits. Director's Ex. 7. Both proposals eliminated Irving's obligation to make 401(k) plan contributions, and both proposals included a revised health insurance proposal. Director's Ex. 6; Director's Ex. 7. Further, both proposals required employees to pay for the cost of federally mandated physical exams, which were required to obtain Commercial Drivers' Licenses. Director's Ex. 6; Director's Ex. 7. Attorney Hall told the Union that it could choose between the two proposals but could not mix and match the provisions. Trans. 75. However, Derek Ray ("Ray"), a member of Irving's management, had authority to negotiate the terms of the separate proposals, so long as the final result stayed within the $31.00 per hour cost range. Trans. 367.

At the meeting, Union President Gerdes asked whether Irving would extend the existing collective bargaining agreement for one week so that the Union could review Irving's proposals. Trans. 29, 75, 359. For reasons unexplained, Irving refused to extend the agreement. Trans. 29, 74-76, 99, 320, 359. Thereafter, Gerdes demanded that Irving's representatives leave the Union Hall, accused Irving of mismanagement, threatened to put Irving out of business, and declared that negotiations were over. Trans. 75-76, 90-91, 101, 320.

## C. Events Following the Failed Negotiations

On May 31, 2010, following the breakdown of negotiation, Irving's drivers were informed that no more negotiation meetings were scheduled. Trans. 190-91, 207, 221-222. On June 1, 2010, all of Irving's drivers went on strike, due to the failure to establish a new collective bargaining agreement. Trans. 76-79, 124, 191, 193, 222. On the same day, attorney Hall faxed a letter to Gerdes stating that Irving no longer recognized the Union as the collective bargaining representative for Irving's drivers and asserting that Irving had no obligation to bargain with the Union. Trans. 77-78; Director's Ex. 23. The letter also advised Gerdes that Irving was withdrawing its former bargaining proposals. Trans. 77-78; Director's Ex. 23.

Thereafter, Irving sent a number of letters to its employees discussing changes to the employee's terms and conditions of employment. Trans. 41-45; Director's Exs. 9-11. Prior to sending the letters, however, Irving neither informed the Union that it was sending the letters nor did Irving offer copies of the letters for the Union to review. Trans. 41-45; Director's Exs. 9-11.

Between June 7 and June 18, 2010, five Irving employees resigned their membership in the Union, crossed the picket line, and returned to work. Trans. 79-84; Director's Exs. 18-22. One of these five employees was a member of the Union's bargaining committee. Trans. 79-80; Director's Ex. 20. On July 14, 2010, Gerdes faxed a letter to Irving indicating the drivers' desire to return to work, ending the strike. Trans. 79, 84; Director's Ex. 15. On July 16, 2010, Irving sent a letter to the Union, reaffirming Irving's withdrawal of recognition of the Union but noting that Irving's drivers could return to work on July 19, 2010. Director's Ex. 16.

When the drivers returned to work, Irving reduced the drivers' pay rate to $18.00 an hour, from the $20.82 rate they were paid under the collective bargaining agreement. Trans. 45-

46.  In addition, Irving changed the means for calculating overtime, paying overtime for time worked over 40 hours a week rather than time worked before 6:00 am and after 5:00 pm and time worked over 8 hours in a single day.  Trans. 45-46.

## D.  Ensuing Litigation

Thereafter, the Union filed four charges with the Board, accusing Irving of engaging in unfair labor practices, in violation of Sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. § 158(a)(1) and (5).  DE 1 at 2.  On August 26, 2010, the Acting General Counsel for the Board filed a consolidated complaint of the Union's charges.  DE 1 at 2.  On September 14, 2010, the consolidated complaint was amended.   DE 1 at 2.  On September 29-30, 2010, an administrative hearing was held before an administrative law judge ("ALJ").  DE 1 at 3.

On October 5, 2010, the Director filed a complaint in this Court for temporary injunctive relief, pending resolution of the administrative proceedings and pursuant to Section 10(j) of the Act.  *See* DE 1 (citing 29 U.S.C. §160(j)). In the Complaint, the Director accused Irving of a number of unfair labor practices, including:

- Irving bargained with no intention of reaching an agreement.
- Irving insisted on proposals which were predictably unacceptable to the Union.
- Irving presented the Union with two regressive and non-negotiable proposals from which to choose.
- Irving presented such proposals to the Union three days before the expiration of the existing collective bargaining agreement and refused to agree to a one-week extension to allow the Union to review the proposals.
- Irving told employment applicants that it intended to remove the Union, four days before the expiration of the collective bargaining agreement.
- Irving impermissibly withdrew recognition of the Union and dealt directly with the employees regarding their return to work and their terms and conditions of employment.
- Irving unilaterally changed the employees' terms and condition of employment.

DE 1 at 5.

To remedy the alleged unfair labor practices, the Director seeks temporary injunctive relief, pending completion of the administrative proceedings, in the following forms.

- A cease and desist order, enjoining Irving from: (1) withdrawing recognition from the Union as the exclusive collective bargaining representative for Irving's drivers; (2) failing or refusing to meet and bargain in good faith with the Union; (3) directly dealing with Irving's employees regarding wages and other terms and conditions of employment; (4) unilaterally changing employee's terms and conditions of employment; (5) announcing Irving's withdrawal of recognition of the Union to Irving employees and employment applicants; (6) interfering with the Section 7 rights of Irving employees in any like manner; and (7) refusing to bargain collectively and in good faith with the Union.
- An order directing Irving to: (1) recognize, and upon request, bargain collectively and in good faith with the Union; (2) restore Irving employees' contractual wage and overtime benefits to the *status quo ante*; (3) rescind its June 1, 2010 letter withdrawing recognition of the Union; (4) rescind all written notifications to employees regarding Irving's intention to withdraw recognition of the Union; (5) post copies of this Court's order at all of Irving's facilities; and (6) file a sworn affidavit of compliance with this Court, within twenty days of this Court's order.

DE 1 at 8-9.

## E. The ALJ's Subsequent Opinion

On December 17, 2010, the ALJ issued an opinion agreeing with all but one of the Director's alleged violations of the Act. [DE 31-2]. Specifically, the ALJ concluded, for purposes relevant to this motion, that Irving violated Section 8(a)(1) and (5) of the Act by ceasing to recognize the Union, dealing directly with unit employees, and unilaterally changing the unit employees' terms and conditions of employment, including those relating to wage rates and overtime benefits. DE 31-2 at 16-17. In addition, the ALJ concluded that Irving violated Section 8(a)(1) of the Act by informing Irving's employees that it was withdrawing recognition from the Union and unilaterally changing the employees' terms and condition of employment. DE 31-2 at 16. Further, the ALJ concluded that Irving violated Section 8(a)(5) of the Act by unilaterally changing the employee pension benefits and Section 8(a)(1) by questioning an

applicant about his willingness to work in the event of a strike. DE 31-2 at 16-17, 19. Critical to these findings was the ALJ's conclusion that Irving's relationship with its employees was made pursuant to Section 9(a) of the Act rather than Section 8(f), as alleged by Irving. DE 31-2 at 13-16. However, the ALJ concluded that Irving did not violate the Act by bargaining in bad faith as alleged and recommended dismissal of this claim of unfair labor practices. DE 31-2 at 17-19.

As a result of the identified violations, the ALJ recommended that Irving restore the terms and conditions of employment to the *status quo ante* in the collective bargaining agreement, until the parties had either bargained to agreement or had bargained to a valid impasse. DE 31-2 at 20-21. Further, the ALJ recommended that Irving be ordered to make its employees whole for any losses in wages, overtime, or other benefits. DE 31-2 at 21.

On December 29, 2010, the Director filed a notice with this Court, noting the conclusions in the ALJ's opinion and repeating the Director's request for Section 10(j) injunctive relief, with the singular exception, consistent with the ALJ's opinion, that the Director was no longer seeking injunctive relief in relation to the Director's claim of bad faith bargaining. [DE 31]. On January 7, 2011, Irving filed a response, repeating many of the same arguments raised in Irving's previous briefs and asserting that Irving intends to challenge the ALJ's decision by filing objections before the Board. [DE 32].

## II. The Director's Motion for Injunctive Relief. [DE 1].

### A. Applicable Law

The Director is authorized to petition a district court for temporary injunctive relief upon issuance under Section 10(j) of the National Labor Relations Act ("Act"). 29 U.S.C. § 160(j). *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 839 (S.D.Ind. 1997). Specifically, in certain

circumstances, Section 10(j) of the Act authorizes a district court to enter "just and proper" injunctive relief, pending the final disposition of an unfair labor practices claim by the Director. 29 U.S.C. § 160(j). *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499-500 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001); *Printpack, Inc.*, 979 F.Supp. at 835; *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996); *Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir. 1989).

Section 10(j) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C.A. § 160.

An injunction granted under § 10(j) is an "extraordinary remedy" and should only be granted in those situations in which effective enforcement of the Act is threatened by the delays inherent in the NLRB dispute resolution process. *Spurlino Materials, LLC*, 546 F.3d at 500; *Francisco Foods, Inc.*, 276 F.3d at 287; *Printpack, Inc.*, 979 F.Supp. at 839-40 (S.D.Ind. 1997); *Electro-Voice, Inc.*, 83 F.3d at 1566.

Nevertheless, the Director is entitled to interim relief when: (1) the Director has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public harm" would occur in the absence of interim relief; and (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint. *Spurlino Materials,*

*LLC*, 546 F.3d at 500; *Francisco Foods, Inc.*, 276 F.3d at 286; *Printpack, Inc.*, 979 F.Supp. at 839.

The Director bears the burden of establishing the first, third, and fourth of these circumstances by a preponderance of the evidence. *Spurlino Materials, LLC*, 546 F.3d at 500; *Francisco Foods, Inc.*, 276 F.3d at 286; *Printpack, Inc.*, 979 F.Supp. at 839; *Electro-Voice, Inc.*, 83 F.3d at 1567. However, the strength of the Director's case on the merits affects this Court's assessment of the relative harms posed by the grant or denial of injunctive relief. *Francisco Foods, Inc.*, 276 F.3d at 286; *Printpack, Inc.*, 979 F.Supp. at 839. As such, the second prong is evaluated on a sliding scale: the better the Director's case on the merits, the less compelling need be his showing of irreparable harm in the absence of an injunction. *Spurlino Materials, LLC*, 546 F.3d at 500; *Francisco Foods, Inc.*, 276 F.3d at 286-87; *Printpack, Inc.*, 979 F.Supp. at 839 ("a strong showing by the Director of likely success on the merits can offset a weak showing of harm."); *Electro-Voice, Inc.*, 83 F.3d at 1568. Once the Director presents evidence sufficient to tip the scales in his favor, nothing more is required. *Electro-Voice, Inc.*, 83 F.3d at 1567. *See also Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir. 1989)("No rule of law limits injunctive relief to serious and extraordinary circumstances.").

This Court will first review the Director's likelihood of success on the merits of the unfair labor practices claims, as the parties focus most of their briefing on addressing that particular factor. Thereafter, this Court will evaluate the other factors that govern whether imposing injunctive relief in this case would be "just and proper."

## B.  Analysis

### 1.  *Likelihood of success on the merits.*

The Director believes there is a strong likelihood that he will be successful, in the underlying administrative litigation, in proving that Irving has violated Sections 8(a)(1) and (5) of the Act.[2]  The Director primarily alleges three violations of the Act: Irving's impermissible withdrawal of recognition of the Union and the collective bargaining agreement; Irving's improper direct dealing; and Irving's failure to continue the terms of the expired collective bargaining agreement and, instead, making unilateral changes to the conditions of employment.

In evaluating the likelihood of success, the Court does not have jurisdiction to rule on the merits of the underlying case before the Board; that is the Board's province.  *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 287 (7th Cir. 2001); *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 840 (S.D.Ind. 1997); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1567 (7th Cir. 1996).  Instead, the Court considers the likelihood of success on the merits only for the purpose of deciding whether injunctive relief is warranted. *Printpack, Inc.*, 979 F.Supp. at 840.

As such, the inquiry is confined to the probability that the Director will prevail. *Spurlino Materials, LLC*, 546 F.3d at 502; *Francisco Foods, Inc.*, 276 F.3d at 287; *Electro-Voice, Inc.*, 83 F.3d at 1568 (7th Cir. 1996).  Specifically, it must be decided whether the Director has a "better

---

[2]Section 8(a) of the Act states in relevant part,
    It shall be an unfair labor practice for an employer:
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7] of this title
    . . .
    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [section 9(a)] of this title.
29 U.S.C. §§ 158(a)(1) and (a)(5).
Section 7 of the Act, states in relevant part,
    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . ..
29 U.S.C. § 157.

than negligible" chance of success; whether the Director has "some chance" of succeeding on the merits. *Spurlino Materials, LLC*, 546 F.3d at 502 (7th Cir. 2008); *Francisco Foods, Inc*., 276 F.3d at 289; *Electro-Voice, Inc.*, 83 F.3d at 1568. In evaluating this likelihood, given the Board's expertise in matters of labor relations, the Court must be hospitable to the Board's view of the law. *Spurlino Materials, LLC*, 546 F.3d at 502; *Francisco Foods, Inc*., 276 F.3d at 287.

a. The parties' dispute regarding the proper characterization of their bargaining relationship.

Underlying the Director's allegations regarding unfair labor practices is a dispute over the proper characterization of Irving's business. Specifically, the Director contends that Irving is not an employer primarily engaged in building and construction, as defined by the Act; and that, therefore, Irving's relationship with the Union was made pursuant to Section 9(a) of the Act. As so characterized, the Director asserts that Irving was not entitled to withdraw recognition of the Union, fail to collectively bargain, unilaterally change the conditions of employment, or deal directly with Irving's drivers. In support, the Director points to a long line of Board cases that have consistently found that a Section 9(a) relationship existed between a ready-mix cement delivery company and its employee drivers.

In contrast, Irving argues that it is engaged primarily in building and construction, and that its bargaining relationship with the Union is, instead, made pursuant to Section 8(f) of the Act. In support, Irving contends that the line of cases cited by the Director were errant in their analysis and should, therefore, be disregarded as valid precedent. In particular, the Director points to a number of Board cases which delineated a clear distinction between two subsections dealing with construction; a distinction that was not specifically addressed in the seminal case cited by the Director. As such, Irving contends that the seminal case's holding that ready-mix

companies are not involved in construction for purposes of Section 8(f), and its progeny, are not valid precedent. Further, Irving argues that, under the proper analysis, Irving would be considered an employer primarily engaged in construction; the parties' relationship would be based upon Section 8(f) pre-hire agreement, rather than a typical Section 9(a) relationship; and Irving would, therefore, have been legally entitled to take the actions it did with respect to the Union and its drivers. *See John Deklewa & Sons*, 282 NLRB 1375.

Collective bargaining agreements are generally governed by Section 9(a) of the Act.[3] *Engineered Steel Concepts, Inc*, 352 NLRB 589, 589 n2 (2008)[4] (citing *Bell Energy Management Corp.*, 291 NLRB 168, 169 (1988)). However, recognizing that the relationships delineated in Section 9 are not particularly amenable to the unique circumstances of the construction industry, where employers ordinarily hire on a project-by-project basis, Congress

---

[3] Section 9(a) states in relevant part,
> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . ..

29 U.S.C.A. § 159(a).

[4] In a footnote to a subsequent filing with the Court, Irving questions the validity of this case, following the Supreme Court's ruling in *New Process Steel, L.P. v. N.L.R.B.*, 130 S.Ct. 2635 (2010). *See* DE 32 at 2 n.1. In *New Process Steel*, the Court reversed a Board ruling which was decided by only two Board members, pending a prolonged vacancy within the Board. *Id.* Alluding to a potentially similar flaw in *Engineered Steel*, but seemingly uncertain in regards to the intended scope of the *New Process Steel* decision, Irving questions but does not directly dispute, *Engineered Steel's* precedential value. *See* DE 32 at 2 n.1 ("Irving is not currently aware of the status or precedential value of that case."). This Court notes that *Engineered Steel* does not appear to have been expressly overruled by any Court. Further, and more important to the case at hand, *Engineered Steel* is not critical to either the Director's arguments or this Court's ruling regarding Section 10(j) relief. Similarly, it is noted that the ALJ did not rely, predominately or in critical part, upon *Engineered Steel* when issuing his opinion. *See generally* DE 31-2. As such, this Court continues to cite *Engineered Steel* for its broad and frequently repeated principles of law in this opinion and order but has, in every relevant circumstance, supplemented the citation with either a second citation or a parenthetical note to *Engineered Steel's* own internal citations, in order to supplement each legal position referenced by the Court. Indeed, *Engineered Steel* is not cited for novel issues of law but, rather, has only been utilized where it is useful to either identify longstanding points of law, commonly found in previous Board decisions, or to highlight consistent trends within the Board's prior precedent. As such, any part of this Court's analysis where *Engineered Steel* appears is bolstered by coetaneous Board precedent, so that the Courts broader conclusions would remain intact, regardless as to whether the Board later decides to reconsider or affirm *Engineered Steel* upon a more direct and materialized challenge to its validity.

enacted Section 8(f) to create alternative rules.[5] *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557, 563 (9th Cir. 1984)(citing S.Rep. No. 187, 86th Cong., 1st Sess. 55-56 (1959)); *J.P. Sturrus Corp.*, 288 NLRB 668, 671 (1988).  Section 8(f) creates exceptions for certain collective bargaining agreements between employers engaged primarily in the building and construction industry and unions having members employed in that industry. *Engineered Steel Concepts, Inc*, 352 NLRB 589, 589 n2 (2008) (citing *Bell Energy Management Corp.*, 291 NLRB 168, 169 (1988)).  For example, under Section 8(f), employers and unions in the construction industry are permitted to enter into a collective bargaining agreement before the union has established its majority status.  *Engineered Steel Concepts, Inc*, 352 NLRB at 600;  *Oklahoma Fixture Co.*, 333 NLRB 804, 807 (2001); *John Deklewa & Sons*, 282 NLRB 1375, 1389 (1987).  *See also J.P. Sturrus Corp.*, 288 NLRB at 671 (noting, as another example, that a pre-hire contract in the building and construction industry may contain a seven-day, rather than a thirty-day, union-security clause).

The nature of the parties' obligations following termination of the collective bargaining agreement depends upon which of the two Sections applies.  *See Engineered Steel Concepts, Inc*, 352 NLRB at 600; *St. John Trucking*, 303 NLRB 723, 729 (1991).  If a bargaining relationship is based upon Section 9(a), an employer must demonstrate actual loss of majority status in order to

---

[5]Section 8(f) states in relevant part,

> It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . .  because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . ..

29 U.S.C.A. § 158(f).

withdraw recognition from a union. *Id. See also St. John Trucking*, 303 NLRB 723, 729 (1991) (noting that a contractually recognized bargaining representative enjoys an irrebuttable presumption of majority status during the life of an existing collective bargaining agreement, and a rebuttable presumption of majority status after the collective bargaining agreement expires); *Lee Lumber and Bldg. Material Corp.*, 322 NLRB 175, 176-77 (2005). Consequently, when an employer repudiates a collective bargaining agreement during or after its term or refuses to negotiate with an established bargaining representative, the employer violates Section 8(a)(1) and (5) of the Act. *Engineered Steel Concepts, Inc*, 352 NLRB at 600; *St. John Trucking*, 303 NLRB at 730; *Newcor Bay City Div. of Newcor, Inc.*, 345 NLRB 1229, 1237 (2005). In contrast, once a Section 8(f) contract expires, either party is free to repudiate the collective bargaining relationship. *Engineered Steel Concepts, Inc*, 352 NLRB at 600 (citing *John Deklewa & Sons*, 282 NLRB 1375 (1987)).

As stated previously, collective bargaining agreements are generally governed by Section 9(a). *Engineered Steel Concepts, Inc*, 352 NLRB at 589 n2 (citing *Bell Energy Management Corp.*, 291 NLRB at 169). Consequently, the burden of proof in determining whether an employer is engaged primarily in the building and construction industry lies with the party seeking to avail itself of the Section 8(f) statutory exception. *Engineered Steel Concepts, Inc*, 352 NLRB at 600; *Bell Energy Management Corp.*, 291 NLRB at 169; *Painters, Local 1247*, 156 NLRB 951, 951 n1 (1966) (*Indio Paint & Rug Center*). *But see John Deklewa and Sons*, 282 NLRB at 1385 n.41 (1987)(holding, in a case where the parties began by entering into a Section 8(f) relationship, . . . "[court's] will require the party asserting the existence of a 9(a) relationship to prove it.").

The Director persuasively contends that the issue of classifying the parties' bargaining relationship has already been determined through prior Board precedent.  In particular, the Director points to an identical challenge raised in *J.P. Sturrus Corp.*, 288 NLRB 668, 671 (1988).  In *J.P. Sturrus*, as in the immediate case, an employer whose business was the delivery of ready-mix concrete argued that its relationship with the employees' Union was made pursuant to Section 8(f) and not Section 9(a) because the employer considered itself to be engaged primarily in the building and construction industry.  *See J.P. Sturrus Corp.*, 288 NLRB at 671.  Relying on prior Board precedent, which determined that ready-mix concrete delivery was not considered construction for purposes of Section 8(e) of the Act,[6] the *J.P. Sturrus* court concluded that, "[t]he Board has held that redi-mix concrete delivery companies are not engaged in the building and construction industry within the meaning of either Section 8(e) or (f) of the Act, and those cases are controlling here."  *Id*. (citing *Inland Concrete Enterprise*, 225 NLRB 209

---

[6] At the time of the *JP Sturrus* decision, there were at least three Board cases which had specifically held that ready-mix concrete delivery was not construction for purposes of Section 8(e) of the Act. For example, the Court notes the following holdings.

> [T]he placement of the building materials by a supplier at the jobsite by dumping or by pouring, including the instance of pouring ready-mixed concrete (which by its very nature cannot be poured on the ground as in the instance of dry materials) directly into building forms, although the product may thus become part of the building structure involved with little or no further work, is merely the final act in the Company's delivery function and does not come within the construction industry exemption.

*Teamsters Local 559*,  138 NLRB 532, 535 (1962)(*Connecticut Sand & Stone Corp.*).

> In Connecticut Sand and Stone Corporation, the Board adopted, in the absence of exceptions, the Trial Examiner's finding therein that the mixing and pouring of ready-mix concrete at a construction site is merely the final act of delivery and does not come within the construction industry exemption. We now affirm that finding, and conclude that the mixing and delivery of ready-mix concrete at construction sites is not construction work but is the delivery of a material or product.

*Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 294*, 145 NLRB 484, 491 (1963) (*Island Dock Lumber, Inc.*).

> In [*Island Dock*], the mixing operation was performed at the jobsite after water was added to the ingredients. Since the Board has held that delivery is not complete until the concrete has been poured, the fact that the supplier operated a concrete-mobile for the mixing and delivery of liquid concrete at the jobsite, here, is insufficient to distinguish the case from Island Dock.

*Joint Council of Teamsters No. 42*, 225 NLRB 209, 216-17 (1976)(*Inland Concrete Enterprises, Inc.*).

(1976) and *Island Dock Lumber Co.*, 145 NLRB 484 (1983)). Thereafter, in at least four

subsequent cases involving similar facts and legal challenges, the Board has upheld the holding

of *J.P. Sturrus*, that ready-mix concrete delivery companies are not engaged in construction for

purposes of Section 8(f) of the Act.[7]

    As such, given the strength of this precedent, the Director argues that it is likely that the

Board will similarly characterize Irving as not engaged in construction and, therefore,

characterize the bargaining relationship as being made pursuant to Section 9(a) and not Section

8(f) of the Act.  Consequently, the Director further contends that he has a strong likelihood of

---

[7] The Court notes the following holdings,

> The [Employer] also argues that [it] is engaged in the building and construction industry, and pursuant to *John Deklewa & Sons*, 282 NLRB 1375 (1987), it was privileged to withdraw recognition of the Union herein on expiration of the contract (Apr. 30, 1989). The above argument does not appear to be available to [the Employer] as a defense because the Board has specifically held that an employer who delivers material such as concrete to building sites is not an employer engaged in the building and construction industry. . . . Consequently, based on the evidence in this record, I find that the Union is a Section 9 bargaining representative and not an 8(f) bargaining representative.

*St. John Trucking*, 303 NLRB 723, 730 (1991)(citing *J.P. Sturrus Corp.*, 288 NLRB 668 (1988))(holding that an employer engaged in the transportation and delivery of stones, sand and commodities at jobsites was not engaged in the building and construction industry for purposes of Section 8(f)).

> In *St. John Trucking Inc.* . . . the employer, who was engaged in the transportation of stone and sand to jobsites, contended that it was a construction industry employer entitled to withdraw recognition under *DeKlewa & Sons*. The Board rejected this contention, a conclusion that was not surprising given the past precedent regarding this type of employer and these types of employees."

*In re Techno Const. Corp.*,  333 NLRB 75, 82-83 (2001) (the court additionally cited the holding of *J.P. Sturrus Corp.* as prior Board precedent that defined construction work within the context of Section 8(f)).

> The Board has held that ready-mix concrete delivery companies are not engaged in the building and construction industry within the meaning of Section 8(f). . . . The fact that . . . drivers occasionally, and at their own discretion, assist the contractor at the construction site with screening and spreading of concrete, after they have poured it where they were not required or asked to perform those functions by the employer or contractor does not bring [the Employer] within the construction industry.

*In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306-07 (2001)(rejecting an argument by a ready-mix delivery company that it was engaged in the building and construction industry for purposes of Section 8(f) and entered into a Section 8(f) pre-hire agreement with the employee Union rather than a Section 9(a) agreement.).

> The Board has addressed the issue in detail with respect to the construction industry status of employers who employ drivers whose function it is to deliver materials to construction sites. . . . The Board has consistently held that the nature of the work performed by [the Employers] and its drivers is not work in the construction industry.

*Engineered Steel Concepts, Inc*, 352 NLRB 589, 602 (2008)(noting all of the cases cited by this Court and concluding, therefore, that employers engaged in the transportation and delivery of scrap steel were not engaged primarily in the building and construction industry and, as a result, were not engaged in a Section 8(f) relationship).

success on his challenge that Irving violated the employee's bargaining rights when Irving withdrew recognition of the Union, refused to collectively bargain, unilaterally changed the conditions of employment, and dealt directly with Irving's employee drivers.

Irving responds by suggesting that *J.P. Sturrus* was wrongly decided, contending that the court failed to conduct a proper Section 8(f) analysis. As such, Irving argues that *J.P. Sturrus* and the entire line of cases upholding that decision are invalid precedent and should be disregarded. Instead, Irving argues that this Court should conduct a Section 8(f) analysis similar to that in *Indio Paint* and conclude that Irving is an employer primarily engaged in the building and construction industry. Such a conclusion, Irving argues, would create the presumption that the parties' agreement was made pursuant to Section 8(f). As a result, Irving would have been entitled to withdraw recognition for the Union, stop collective bargaining and deal directly with its employees. In support of its argument, Irving points not to the difference between Sections 8(f) and 9(a) of the Act, but rather, to the difference between Sections 8(e) and 8(f).

Irving is correct insofar as it notes that, even though Sections 8(e) and 8(f) make exceptions for employers in the construction industry, these particular Sections have different purposes. For example, Section 8(e) of the Act[8] deals with "hot cargo" agreements, establishing that it shall be an unfair labor practice for a union and an employer to enter into any contract in

---

[8] Section 8(e) provides in relevant part,
> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work

29 U.S.C.A. § 158(e).

which the employer agrees to cease from handling, using, selling, transporting, or otherwise

dealing in any of the products of any other employer or to cease doing business with any other

person. *Joint Council of Teamsters No. 42*, 225 NLRB 209, 216 (1976) (*Inland Concrete

Enterprises, Inc.*). 29 U.S.C.A. § 158(e). Under a proviso of the same Section, however, an

exception is made for agreements between a union and an employer engaged in the "construction

industry" for the contracting or subcontracting of work at a construction site. *Joint Council of

Teamsters No. 42*, 225 NLRB 209, 216 (1976) (*Inland Concrete Enterprises, Inc.*). 29 U.S.C.A.

§ 158(e).

 In contrast, as previously discussed, Section 8(f) creates exceptions to the traditional

Section 9(a) bargaining relationships between employers engaged primarily in the building and

construction industry and unions having members employed in that industry. *Engineered Steel

Concepts, Inc*, 352 NLRB at 589 n.2 (citing *Bell Energy Management Corp.*, 291 NLRB at 169

(1988)). Primarily, under Section 8(f), employers and unions in the construction industry are

permitted to enter into "pre-hire" agreements before the union has established its majority

status.[9] *Engineered Steel Concepts, Inc*, 352 NLRB at 600; *J.P. Sturrus Corp.*, 288 NLRB at

671.

 Further, Irving is also correct that the Board has, at times, delineated the applicable scope

of each Section.  In particular, the Board has noted that the category of employers implicated by

Section 8(f) is smaller than that of Section 8(e), noting that the language of Section 8(f) restricts

---

[9] Further, several courts have noted that, common to many Section 8(f) pre-hire agreements, are seven-day,
rather than thirty-day, grace periods in which the employee must join the union. *J.P. Sturrus Corp.*, 288 NLRB 668,
671-72 (1988); *St. John Trucking*, 303 NLRB 723, 730 (1991); *In re Mastronardi Mason Materials Co.*, 336 NLRB
1296, 1306-07 (2001). These courts have frequently considered the absence of such seven-day "union-security
clauses" to be evidence that the parties' relationship was not that of a Section 8(f) pre-hire agreement. *Id.*

its application to employers "primarily" engaged in construction. *See Building & Const. Trades Council*, 183 NLRB 1032, 1036-37 (1970) (*Church's Fried Chicken, Inc.*). In addition, the Seventh Circuit has concluded, in at least one circumstance, that the Board's failure to follow, without explanation, its prior precedents in regards to this distinguishing factor warrants treatment of the Board's conclusions as "aberrational" and warranting less precedential value. *See Milwaukee and Southeast Wisconsin Dist. Council of Carpenters v. Rowley-Schlimgen, Inc.*, 2 F.3d 765, 768-769 (7th Cir. 1993) ("[W]hen the NLRB fails to distinguish contradictory decisions rendered in similar cases, it forfeits the deference we would otherwise show to its very considerable expertise in strictly labor matters.").

Finally, Irving is also correct in noting that the Board has delineated what findings are commonly considered to establish a Section 8(f) relationship. By its terms, Section 8(f) imposes three prerequisites on a pre-hire agreement in order to bring the agreement within its coverage: (1) the agreement must be with an employer engaged primarily in the building and construction industry; (2) the agreement must cover employees who are engaged in the building and construction industry; and (3) the agreement must be with a labor organization of which building and construction employees are members. 29 U.S.C.A. § 158(f). *Engineered Steel Concepts, Inc*, 352 NLRB at 600; *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557, 562 (9th Cir. 1984); *Painters, Local 1247*, 156 NLRB 951, 957 (1966) (*Indio Paint*).

Interpreting these, the Board, in *Indio Paint*, found the factor, "employer primarily engaged in the building and construction industry," to be satisfied where an employer contributed "labor and materials" for construction in an amount equaling 91% of the companies'

annual revenue.  *See Indio Paint & Rug Center*, 156 NLRB 951, 959-60 (1966).  *See also Construction, Bldg. Materials & Misc. Drivers, Local 83*, affirming the *Indio Paint* holding as follows,

> Thus the Board has found that Section 8(f) applies to employers who provide both labor and materials for construction without regard to whether the greater amount of revenue comes from the labor or from the materials. . . . However, the 8(f) exemption has been denied to employers whose business involves the manufacture of constuction [sic] materials which are installed by employees of a different employer and to employers who have only a minimal involvement in the construction process.

243 NLRB 328, 331 (1979). In addition, at least in situations where the employer has already been determined to be primarily engaged in construction, the Board has found the phrase, "employees engaged in the building and construction industry," to be satisfied where a substantial part, but less than a majority, of the employees' work is engaged in construction. *See In re Techno Const. Corp.*,  333 NLRB 75, 83-84 (2001)(citing *Operating Engineers Pension Trust*, 746 F.2d at563).

Recognizing these prior precedents, Irving asserts that the *J.P. Sturrus* court improperly disregarded the distinctions between Sections 8(e) and 8(f) and failed to conduct a proper Section 8(f) analysis.  Relying upon *Rowley-Schlimgen, Inc.*, Irving asks the Court to disregard the precedential value of *J.P. Sturrus* and its twenty-year progeny.  Irving suggests that the Court should conduct an independent factual evaluation of Irving's business to determine whether Irving contributes "labor and materials" to construction in sufficient proportion of its overall revenue, similar to the analysis in *Indio Paint*.  Irving asserts that such an analysis is more consistent with Board precedent and would affirmatively establish that Irving is an employer primarily engaged in the building and construction industry, rendering the parties' relationship pursuant to Section 8(f) and not Section 9(a).  However, the Court is not persuaded.

To begin, in evaluating the parties' arguments the Court is mindful that it does not have jurisdiction to rule on the merits of the underlying case before the Board. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 287 (7th Cir. 2001); *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 840 (S.D.Ind. 1997); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1567 (7th Cir. 1996). Instead, for the sole purpose of deciding whether injunctive relief is warranted, jurisdiction is limited to determining whether the Director has a "better than negligible" chance of success on the merits. *Spurlino Materials, LLC*, 546 F.3d at 502 (7th Cir. 2008); *Francisco Foods, Inc*., 276 F.3d at 289; *Printpack, Inc.*, 979 F.Supp. at 840; *Electro-Voice, Inc.*, 83 F.3d at 1570. In doing so, the Court is hospitable to the Board's view of the law and focuses its determination on the Director's likelihood of success. *See Spurlino Materials, LLC*, 546 F.3d at 502; *Francisco Foods, Inc*., 276 F.3d at 287. *See also N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1569 (7th Cir. 1996)(asserting that the Court's role was limited to evaluating the Director's likelihood of success on the merits, even though the Director's witnesses had credibility issues and the employer had offered plausible explanations for its actions).

As to this issue, the Director has a better than negligible likelihood of success. Despite Irving's argument that the Board in *J.P. Sturrus* failed to properly delineate between Sections 8(e) and 8(f), the Board has upheld the conclusion of *J.P. Sturrus*, that ready-mix companies are not engaged in construction for purposes of Section 8(f), on multiple occasions. *See Engineered Steel Concepts, Inc*, 352 NLRB at 602 (noting entire line of *J.P. Sturrus* cases and concluding that employers engaged in the transportation and delivery of scrap steel were not engaged primarily in the building and construction industry and, as a result, could not enter into a Section

8(f) relationship); *In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306-07 (2001)(affirming *J.P. Sturrus* holding regarding ready-mix concrete delivery companies); *In re Techno Const. Corp.*, 333 NLRB 75, 82-83 (2001) (court cited the holding of *J.P. Sturrus* as prior Board precedent that defined construction work within the context of Section 8(f)); *St. John Trucking*, 303 NLRB 723, 730 (1991)(citing *J. P. Sturrus Corp.* decision and holding that an employer engaged in the transportation and delivery of stones, sand and commodities at job sites was not engaged in the building and construction industry for purposes of Section 8(f)). Indeed, the Board's affirmative treatment of the holding in *J.P. Sturrus* spans over twenty years and at least four subsequent cases. *Id.*

     Further, such affirmative treatment is even found in a case cited by Irving as having "unraveled everything that [the Board] had packaged into *J.P. Sturrus*." In *In re Techno Const. Corp.* the Board established that, at least in situations where the employer has already been determined to be primarily engaged in construction, the factor "employees engaged in the building and construction industry" is satisfied where a substantial part, but less than a majority, of the employees' work is engaged in construction. *See In re Techno Const. Corp.*, 333 NLRB at 83-84. However, the Board so ruled only after recognizing *J.P. Sturrus* and *St. John Trucking Inc.* as valid Board precedent defining construction work within the context of Section 8(f). *See Id.* at 82-83. After reviewing both cases, the Board noted that the holding in *St. John's Trucking* was "not surprising given the past precedent regarding this type of employer and these types of employees." *Id.* As such, contrary to Irving's contention, *In re Techno Const. Corp.* recognizes the precedential value of *J.P. Sturrus*, at least in its narrow application to ready-mix concrete

delivery companies, while also carving out more specific definitions to be used in future cases determining whether a Section 8(f) relationship exists.

Additionally persuasive, Irving offers nothing to factually or legally distinguish this case from *J.P. Sturrus* or any of its progeny.  Indeed, the factual circumstances of Irving's ready-mix concrete delivery business and Irving's legal challenge, pursuant to *John Deklewa and Sons*, are indistinguishable from the facts and legal challenges raised in previous Board cases that have rejected identical arguments.[10]  *See e.g. In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306-07 (2001)(affirming the *J.P. Sturrus* holding regarding ready-mix concrete delivery companies and Section 8(f)); *St. John Trucking*, 303 NLRB at 730 (holding that an employer engaged in the transportation and delivery of stones, sand and commodities at job sites was not engaged in the building and construction industry for purposes of Section 8(f)); *J.P. Sturrus Corp.*, 288 NLRB at 671 ("[t]he Board has held that redi-mix concrete delivery companies are not engaged in the building and construction industry within the meaning of either Section 8(e) or (f) of the Act, and those cases are controlling here.").

Instead, Irving's justification for its alleged unfair labor practices succeeds or fails on Irving's attempt to persuade the Board that *J.P. Sturrus* was wrongly decided.  As such, in order for Irving to prevail on the merits, Irving will have to successfully convince the Board that it should overrule the holding of *J.P. Sturrus* and every case that follows it.  Given the Board's

---

[10] In addition, like in other cases, the parties' collective bargaining agreement contains a thirty-day Union security clause, rather than a seven-day clause, common in most pre-hire agreements.  *See* Director's Ex. 2 at 4. Several courts have noted that the absence of such seven-day "union security clauses" is further evidence that the parties' relationship was not that of a Section 8(f) pre-hire agreement.  *Id. J.P. Sturrus Corp.*, 288 NLRB 668, 671-72 (1988); *St. John Trucking*, 303 NLRB 723, 730 (1991); *In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306-07 (2001). *See* also ALJ's opinion, DE 31-2 at 15 (citing the holding in *Mastronardi* and noting that "the contract between the Union and the Respondent allows new employees 30 days to join the union, rather than the 7 days permitted in contracts under Section 8(f)").

favorable treatment of *J.P. Sturrus* over the past twenty-two years, the prospects of such

treatment by the Board seem slim. Put differently, the Director's likelihood of success in this

regard appears "better than negligible.".

The Court's analysis regarding the Director's likelihood of success is further bolstered by

the December 17, 2010 decision by the ALJ. A district court, deciding whether to grant a

petition for Section 10(j) injunctive relief, is advised to give deference to the opinions rendered

by the ALJ, particularly in regards to the ALJ's findings in relation to the petitioner's likelihood

of success on the merits. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502-03 (7th Cir.

2008).

> [T]he ALJ's decision . . is [] relevant to the propriety of section 10(j) relief.
> Assessing the Director's likelihood of success calls for a predictive judgment about
> what the Board is likely to do with the case. The ALJ is the Board's first-level
> decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal
> determinations supply a useful benchmark against which the Director's prospects of
> success may be weighed.

*Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 288, 300 -301 (7th Cir. 2001) (holding that the

Director had a strong-likelihood of success on the merits, based, in large part, upon the ALJ's

decision in favor of the Director). *See also Frye Elec., Inc.*, 539 F.Supp.2d at 1118 -1119;

*Chavarry v. E.L.C. Electric, Inc.*, 2004 WL 2137644, at *5 (S.D.Ind. 2004); *Moran*, 286

F.Supp.2d at 1013 (noting, in addition, the Board's policy of not overruling an ALJ's credibility

determinations absent a clear preponderance of the evidence to the contrary).

The ALJ also rejected Irving's characterization of its relationship with its employees

under Section 8(f) rather than Section 9(a). *See* DE 31-2 at 14-16. The ALJ noted the Board's

previous conclusions that ready-mix delivery companies are not employers engaged in the

building and construction industry for the purposes of Section 8(f) of the Act. *Id.* (citing *J.P.*

*Sturrus Corp.*, 288 NLRB 668, 671 (1988) and *In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306 (2001)). Further, the ALJ held that Irving failed to meaningfully distinguish the facts in this case from the Board's prior precedent, which had repeatedly held that such companies were suppliers of materials and not, themselves, engaged in construction. *Id.* Finally, the ALJ also rejected Irving's argument that *J.P. Sturrus* was wrongly decided by the Board, holding, like this Court, that subsequent Board decisions have affirmed the holdings of *J.P. Sturrus*. *Id.* In concluding, the ALJ noted that he was bound to follow prior Board precedent, like *J.P. Sturrus*, and noted that, even so, the ALJ also considered Irving's arguments regarding the validity of the precedential value of the relevant cases to be unpersuasive. *Id.*

b. The Director's likelihood of success regarding the unfair labor practice claims.

Having determined that the Director has a better than negligible likelihood of success in establishing that the parties had a Section 9(a) relationship, the Court concludes that the Director has a similar likelihood of success in establishing that Irving violated Sections 8(a)(1) and (5) of the Act by refusing to recognize the Union, by directly dealing with Irving's drivers, and by disregarding the expired collective bargaining agreement and enacting unilateral changes to the terms and conditions of employment.

i. Refusing to recognize the Union

Irving does not dispute that it stopped acknowledging the Union when the parties previous collective bargaining agreement expired. *See also* Trans. 77-78; Director's Ex. 16; Director's Ex. 23. Instead, Irving relies solely upon its argument that it was entitled to do so because of Irving's belief that it had a Section 8(f) relationship with Irving's drivers. Having already determined that the Director has a better than negligible likelihood of success in

establishing that the parties had a Section 9(a) relationship, the Court concludes that the Director

has a similar likelihood of success in establishing that Irving violated Sections 8(a)(1) and (5) of

the Act, when Irving stopped acknowledging the Union as the driver's collective bargaining

representative. *See Engineered Steel Concepts, Inc*, 352 NLRB at 606 (holding that two

employers violated Section 8(a)(1) and (5) of the Act by refusing to recognize and bargain

collectively with the Union); *St. John Trucking*, 303 NLRB at 729-30 (holding that an employer

unlawfully withdrew recognition of the Union, and by doing so, the employer failed and refused

to bargain with the Union, in violation of Section 8(a)(1) and (5) of the Act.); *J.P. Sturrus Corp.*,

288 NLRB at 672 ("By failing and refusing to recognize and bargain collectively in good faith

with the Union as the exclusive collective-bargaining representative of the employees . . . the

[Employer] has violated Section 8(a)(1) and (5) of the Act."). *See also* ALJ's decision, DE 31-2

at 16 ("The contract in this case was governed by Section 9 . . .. Therefore [Irving] had a

continuing obligation to recognize and a [sic] bargain with the Union after the expiration date of

the last collective bargaining agreement and violated Section 8(a)(5) and (1) since about June 1,

2010 by ceasing to recognize the Union.").

> ii.  Direct dealing and making unilateral changes to the terms and
> conditions of employment

Similarly, Irving does not dispute that, following expiration of the collective bargaining

agreement, Irving dealt directly with its driver employees and unilaterally changed the terms and

conditions of their employment, in regards to wage rates and overtime calculation.  Instead,

Irving again contends that it was justified in doing so based upon its alleged relationship status

with the Union.  For the same reasons, the Director has a better than negligible likelihood of

success in establishing that Irving violated Sections 8(a)(1) and (5) of the Act based upon

Irving's direct dealing and making unilateral changes to the terms and conditions of the driver's employment.

An employer who deals directly with its unionized employees regarding terms and conditions of employment violates Section 8(a)(1) and (5). *Northwest Graphics, Inc.*, 343 NLRB 84, 93 (2004). Unlawful direct dealing occurs when an employer communicates directly with union-represented employees, without the benefit of Union representation, for the purpose of changing wages, hours, and terms and conditions of employment. *El Paso Electric Co.*, 355 NLRB No. 95 at *2 (2010). In addition, an employer, obligated to bargain with the representative of its employees, may not make unilateral changes to wages, hours and terms and conditions of employment. *Clarke Manufacturing , Inc.*, 352 NLRB 141, 144 (2008); *Parkview Furniture Mfg. Co.*, 284 NLRB 947, 971 (1987). *See also In re Mastronardi Mason Materials Co.*, 336 NLRB at 1308-09 (holding that an employer made unilateral changes to the conditions of employment, in violation of Sections 8(a)(1) and (5), by failing to continue the terms and conditions of employment as set forth in an expired collective bargaining agreement, failing to make pension contributions, and changing the method for calculating wages); *Engineered Steel Concepts, Inc*, 352 NLRB at 606.

Instead, an employer and the employees' bargaining representative are required to bargain in good faith regarding these matters. *See N.L.R.B. v. Borg-Warner Corp.*, 356 U.S. 342 (1958). This duty continues even after the expiration of a collective bargaining agreement; and an employer may not, in the interim, unilaterally alter the terms of conditions of employment, as set forth in the expiring collective bargaining agreement, unless there is an impasse in

negotiations,[11] the Union's loss of majority status has been established,[12] or there is a waiver of bargaining rights.  *Parkview Furniture Mfg. Co.*, 284 NLRB at 971-72;  *In re Mastronardi Mason Materials Co.*, 336 NLRB at 1308-09 (holding that an employer was not entitled to unilaterally change terms and conditions of employment, as established in a previously expired collective bargaining agreement, prior to establishing a valid impasse in negotiations.").

Irving does not dispute that, following the expiration of the collective bargaining agreement, it began communicating with its drivers, via letters, in regards to changing the terms and conditions of employment.  *See* Trans. 41-45; Director's Exs. 9-11.  Irving also does not dispute that it made such communication directly to its drivers, without first informing the Union.  *Id.*  Further, Irving does not dispute that, upon the drivers' return to work, Irving disregarded the prior provisions of the expired collective bargaining agreement, unilaterally reduced the drivers' pay rate by almost three dollars an hour and changed the method for calculating overtime wages. *See* Trans. 45-46.

---

[11]   A genuine impasse in negotiations exists when the parties are warranted in assuming that further bargaining would be futile. *In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1306 (2001).  Such an impasse may occur where the parties have fully discussed the issues, in good faith, but are unwilling to move from their positions. *Id.* at 1306-07 (holding that an impasse did not exist where the parties' negotiations were abbreviated and were not made with a good faith and serious effort towards reaching an agreement). "It is an issue of futility, and not of some lesser level of frustration, discouragement, or apparent gamesmanship." *Northwest Graphics, Inc.*, 343 NLRB 84, 91(2004). The determination of impasse involves an inquiry into "a myriad of circumstances," including (1) the background and relationship of the parties, (2) their willingness to negotiate, (3) the extent and frequency of bargaining, (4) the integrity of the bargaining, and (5) the good or bad faith of the parties. *Clarke Manufacturing, Inc.*, 352 NLRB 141, 144 (2008). The burden of proving that an impasse exists is on the party asserting the impasse. *In re Mastronardi Mason Materials Co.*, 336 NLRB at 1306.
    Irving does not contend that the parties' negotiations failed due to an impasse but rather asserts that Union President Gerdes waived the Union's rights as the collective bargaining representative, by expelling Irving's representatives from the Union hall during the parties' third and final negotiating session. *See also* ALJ's opinion, DE 31-2 at 14 n.7 (observing that Irving does not assert that negotiations were terminated due to an impasse).

[12]   "[T]he Board has long held that a contractually recognized bargaining representative of employees' enjoys an irrebuttable presumption of majority status during the life of the contract, and a rebuttable presumption of majority status after the contract expires."  *St. John Trucking*, 303 NLRB 723, 729 (1991)(holding that there was a rebuttable presumption of majority status, even eleven months after a collective bargaining agreement expired).

Without proof that Irving was relieved of its duty to recognize the Union and collectively bargain with the same, such actions constitute impermissible direct dealing and improper unilateral changes to the terms and conditions of employment, in violation of Sections 8(a)(1) and (5) of the Act. *See Northwest Graphics, Inc.*, 343 NLRB at 93 (direct dealing); *El Paso Electric Co.*, 355 NLRB No. 95 at *2. *See also Engineered Steel Concepts, Inc*, 352 NLRB at 606 (unilateral changes to terms of employment); *Clarke Manufacturing , Inc.*, 352 NLRB at 144; *In re Mastronardi Mason Materials Co.*, 336 NLRB at 1308-09; *Parkview Furniture Mfg. Co.*, 284 NLRB at 971-72. Having determined that the Director has a better than negligible chance of demonstrating a Section 9(a) relationship, Irving has not established that it was so relieved of its duties to recognize and collectively bargain with the Union. As such, the Director has a better than negligible chance of proving that Irving's actions, in this regard, were also in violation of the Act. *See also* ALJ's decision, DE 31-2 at 16 ("The contract in this case was governed by Section 9 . . .. Therefore [Irving] had a continuing obligation to recognize and a [sic] bargain with the Union after the expiration date of the last collective bargaining agreement and violated Section 8(a)(5) and (1) since about June 1, 2010 . . . by bypassing the Union and dealing directly with unit employees [] and unilaterally changing the employees' terms and conditions of employment including those relating to wage rates and overtime benefits.").

### iii.  Bad faith bargaining

Lastly, recognizing the ALJ's recommended dismissal of the Director's claim of bad faith bargaining, DE 31-2 at 17-19, and the Director's subsequent withdrawal of his request for temporary injunctive relief on this claim, DE 31 at 4, the Court will not spend more time or resources considering whether the Director has a similar likelihood of success on the merits in

regards to the Director's claim of bad faith bargaining. Therefore, the Court no longer considers bad faith bargaining to be an asserted justification for imposition of Section 10(j) injunctive relief.

In sum, the Director has a better than negligible chance of succeeding on the merits in regards to each of its claims of unfair labor practices. Specifically, the Director has a better than negligible likelihood of success in establishing that the parties had a Section 9(a) relationship. As a consequence, the Director has a similar likelihood of success in establishing that Irving violated Sections 8(a)(1) and (5) of the Act by refusing to recognize the Union, by directly dealing with Irving's drivers, and by disregarding the expired collective bargaining agreement and, instead, enacting unilateral changes to the terms and conditions of employment.

## 2. Adequate Remedies at Law

Section 10(j) relief is an extraordinary remedy, reserved for those situations in which the effective enforcement of the Act is threatened by the delays inherent in the NLRB dispute resolution process. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 287 (7th Cir. 2001); *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 840 (S.D.Ind. 1997); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996); *Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir. 1989). The purpose of Section 10(j) is to prevent employers from taking advantage of the "extraordinarily slow" NLRB resolution process to quash union support in the interim. *Spurlino Materials, LLC*, 546 F.3d at 500. *See also Pioneer Press*, 881 F.2d at 488 (citing S.Rep. No. 80-105, 80th Cong., 1st Sess. 8 (1947)). "A court should evaluate the equities 'through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the

Board's remedial power while it processes the charge.'" *Printpack, Inc.*, 979 F.Supp. at 847.

In assessing the propriety of injunctive relief, consideration must be given to the collective bargaining rights of the employees and what belated relief may mean to the future exercise of those rights. *Francisco Foods, Inc.*, 276 F.3d at 297. The Court must consider whether, in the absence of the requested injunctive relief, the collective bargaining and organizing rights of the employees will be irreparably undermined. *Francisco Foods, Inc.*, 276 F.3d at 297; *Electro-Voice, Inc.*, 83 F.3d at 1567 ("[C]onsidering the aforementioned factors . . ., this Court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual.").

Considering the facts of this case, the remedial authority of the Board cannot entirely cure the harms that are likely to occur in the interim. Notably, Irving's actions have dramatically shifted the *status quo* between itself and its employees by refusing to bargain with the employees' collective bargaining representative and failing to abide by the terms of the expired collective bargaining agreement. Further, as time passes, Irving's actions diminish the Union's ability to organize and effectively represent Irving's employees after the Board issues its order. Consequently, the Director is without adequate remedies at law and temporary injunctive relief is necessary.

Since the expiration of the collective bargaining agreement on May 31, 2010, Irving has refused to negotiate with the employees' lawfully-recognized bargaining representative, thereby, stripping its employees of their collective bargaining rights. Trans. 77-78; Director's Ex. 23. This unlawful disruption of the balance of economic power sufficiently demonstrates the type of

irreparable harm that cannot be adequately remedied by a protracted Board decision. *See Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 849 (S.D.Ind. 1997). Further, Irving has conditioned its employees' return to work on their acceptance of a number of unilateral and regressive changes to the employees' terms and conditions of employment. Trans. 41-46; Director's Exs. 9-11. Such a demonstrated loss of benefits, otherwise secured from good-faith collective bargaining, is another type of harm that cannot be fully remedied by a future Board decision in the Director's favor. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001).

Moreover, a remedial order by the Board can not cure harms being made to the Union's ability to effectively organize and represent Irving's employees in the future. It may be years before the Board reaches the merits of the Director's case. *See e.g. N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). In the interim, however, Irving's alleged unfair labor practices have the potential to be "enormously destructive" on the Union's organizational efforts. *See Electro-Voice, Inc.*, 83 F.3d at 1575. For example, as of June 18, 2010, the Union has already lost five of its twenty-three members, including a member of the Union's bargaining committee. Trans. 50, 79-84; Director's Exs. 18-22. Such diminution in Union support in the interim increases the likelihood that Irving's employees will be irreparably deprived of Union representation when the Board finally issues its order. *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 848 (S.D.Ind. 1997)("As time passes, the benefits of unionization are lost and the spark to organize is extinguished."). *See also Electro-Voice, Inc.*, 83 F.3d at 1573 (holding that leaving employer-based challenges to Union participation unaddressed in the interim had the potential to deteriorate Union support to the point that effective organization and representation is no longer

possible).  Consequently, the diminution of Union support is also a sufficient demonstration of irreparable harm to the collective bargaining process to justify interim relief. *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 848 (S.D.Ind. 1997); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996).

The longer that Irving is able to avoid bargaining with the Union, the less likely the Union will to be able to organize and represent Irving's employees effectively if and when the Board orders Irving to commence bargaining. *See Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 299 (7th Cir. 2001); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008). Put differently, absent temporary injunctive relief, the less likely an order in the Director's favor will be able to redress the wrongs that have been done and the more likely Irving will be able to achieve an illegal purpose. *Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 300 (7th Cir. 2001); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1575 (7th Cir. 1996). Consequently, this Court concludes that temporary injunctive relief is necessary to protect the collective bargaining and organizational rights of Irving's employees.  For the same reasons, there is no adequate remedy at law. *See Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 848-49 (S.D.Ind. 1997); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996).  As such, restoration of the *status quo ante*, via temporary injunctive relief, is a necessary means to preserve the Board's ultimate ability to provide meaningful redress for the wrongs alleged. *See Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 300 (7th Cir. 2001).

### 3. Public Interest

Injunctive relief under Section 10(j) is intended to protect public rather than private interests. *Bloedorn v. Francisco Foods, Inc*., 276 F.3d 270, 300 (7th Cir. 2001); *Lineback v.*

*Printpack, Inc.*, 979 F.Supp. 831, 847 (S.D.Ind. 1997)("The Director need not show . . . harm to third parties."). In particular, the interest at stake in a Section 10(j) proceeding is the integrity of the collective bargaining process. *Francisco Foods, Inc.*, 276 F.3d at 300; *Printpack, Inc.*, 979 F.Supp. at 847 ("Public harm" occurs when the remedial purpose of the Act is undermined.").

This public interest is particularly at risk when the protracted nature of Board proceedings threatens to undermine the Board's ability to remedy unfair labor practices. *Francisco Foods, Inc.*, 276 F.3d at 300; *Printpack, Inc.*, 979 F.Supp. at 847 ("The public interest is harmed when the Board's remedial powers under the Act lose their effectiveness with the passage of time."). Thus, the public interest is furthered when the provisions of the Act are enforced and when an unfair labor practice is not permitted to succeed as a result of lengthy Board adjudications. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Printpack, Inc.*, 979 F.Supp. at 847; *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1574 (7th Cir. 1996).

Given the nature of the unfair labor practices charged in this case, temporary injunctive relief would serve the public interest. The harm suffered by Irving's employees on account of Irving's refusal to recognize their chosen collective bargaining representative and the resulting loss of support for the Union is severe. Further, as previously discussed, the longer the Board takes to make a decision, the less likely such a decision will be able to remedy these harms, allegedly incurred on account of Irving's unfair labor practices. *See Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 300 (7th Cir. 2001). Such a showing of irreparable harm, exacerbated by the passage of

time, leads to the conclusion that temporary injunctive relief in this case is in the public interest. *Id*.

### 4. Balancing the Equities

In addition to demonstrating some likelihood of success on the merits, the Director must show, absent an injunction, the labor effort will likely be irreparably harmed, and that such irreparable harm to the labor effort outweighs any comparable harm to the employer. *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 847 (S.D.Ind. 1997); *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989). As stated previously, the strength of the Director's case on the merits affects the assessment of the relative harms. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286-87 (7th Cir. 2001); *Printpack, Inc.*, 979 F.Supp. at 839. Specifically, the greater the Director's prospects of prevailing on the merits, the less compelling a showing of irreparable harm is required, and vice versa. *Spurlino Materials, LLC*, 546 F.3d at 502; *Francisco Foods, Inc.*, 276 F.3d at 286; *Printpack, Inc.*, 979 F.Supp. at 839 ("a strong showing by the Director of likely success on the merits can offset a weak showing of harm."); *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1567-68 (7th Cir. 1996)("the Director need not demonstrate that the harm to the labor effort outweighs the harm to the employer if the Director makes a strong showing [of likely success on the merits].").

The Court has already concluded that the Director has a "better than negligible" likelihood of success on the merits of its unfair labor charges pending before the Board. Further, Irving's employees are currently suffering significant harm due to Irving's refusal to collectively bargaining with their chosen representative, and that the Union's ability to represent the

employees' interests in the future will likely suffer irreparable harm in the absence of interim injunctive relief. As such, from the outset, the equities tip strongly in the Director's favor.

In contrast, Irving argues that imposing temporary injunctive relief would cause Irving fiscal harm, due to Irving's precarious financial situation. *See* DE 22 at 31-33. To begin, most of the relief requested by the Director would have a minimal financial impact upon Irving if granted. Such requested relief includes enjoining Irving from: withdrawing recognition from the Union as the exclusive collective bargaining representative for Irving's drivers, failing or refusing to meet and bargain collectively in good faith with the Union, directly dealing with Irving's employees regarding wages and other terms and conditions of employment, announcing Irving's withdrawal of recognition of the Union to Irving employees and employment applicants, refusing to bargain collectively, and interfering with the Section 7 rights of Irving's employees in any like manner[13]. *See* DE 1 at 8-9. Additionally non-economically invasive, the Director also requests an order directing Irving to: recognize, and upon request, bargain collectively with the Union, rescind its June 1, 2010 letter withdrawing recognition of the Union, rescind all written notifications to employees regarding Irving's intention to withdraw recognition of the Union, and engage in compliance-based activities with this Court's order, such as posting copies and filing a sworn affidavit of compliance. *See* DE 1 at 8-9. Because these forms of relief are likely to have a minimal economic impact on Irving's business, Irving's attempts to avoid these forms of relief, solely based upon economic hardship, are without merit.

---

[13]This provision has been found in at least two district court orders granting Section 10(j) relief, within the Circuit. *See Barker ex. rel. N.L.R.B. v. Regal Health and Rehab Center, Inc.*, 632 F.Supp.2d 817, 836 (N.D.Ill. 2009); *Lineback v. Spurlino Materials, LLC*, 2007 WL 3334786, *12 (S.D.Ind. 2007) *See also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 505-07 (7th Cir. 2008) (noting that the language "any like manner" did not exceed the acceptable scope of injunctive relief).

Further, such actions not only impose a minimal economic impact upon Irving, but they are also, based upon the likely-to-be-established Section 9(a) relationship, mandated upon Irving by the Act. *See generally* 29 U.S.C. §§ 158(a)(1) and (a)(5); 29 U.S.C. § 157. *See also Engineered Steel Concepts, Inc*, 352 NLRB at 606 (holding that two employers violated Section 8(a)(1) and (5) of the Act by refusing to recognize and bargain collectively with the Union); *St. John Trucking*, 303 NLRB at 729-30 (holding that an employer unlawfully withdrew recognition of the Union in violation of Section 8(a)(1) and (5) of the Act.); *J.P. Sturrus Corp.*, 288 NLRB at 672 (holding that an employer violated Section 8(a)(1) and (5) of the Act by refusing to recognize a Union). *Northwest Graphics, Inc.*, 343 NLRB 84, 93 (2004)(holding that direct dealing violates Section 8(a)(5) and (1) of the Act); *In re Hardesty Co., Inc.*, 336 NLRB 258, 259-60 (2001). Consequently, in light of the Court's ruling that the Director has a better than negligible likelihood of success of establishing the existence of a Section 9(a) relationship and a similar likelihood of success that Irving has violated and continues to violate the Act, the Court is further persuaded that Irving's should not be permitted to avoid its legally-imposed duties based solely upon alleged limited economic hardships.

Indeed, it appears that only two forms of relief requested by the Director could potentially impose an economic impact upon Irving. These include enjoining Irving from unilaterally changing the employees' terms and conditions of employment and ordering Irving to restore Irving's wage and overtime benefits to the *status quo ante*, as dictated by the expired collective bargaining agreement.

Unlike the other forms of relief, granting these may cause Irving to incur some temporary financial hardship. Irving would be required, at least temporarily, to restore its employees' hourly pay to $20.82 from $18.00, as previously dictated by the expired collective bargaining agreement, and would be required to restore the prior method for calculating overtime pay. Trans. 45-46. However,

this hardship does not appear as imposing as Irving suggests, as it merely restores the employment terms to what they were before Irving abandoned the terms and conditions of the collective bargaining agreement. Such temporary restoration of the *status quo ante* is precisely what Section 10(j) relief is intended to provide.

> The status quo which deserves protection under § 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated. Instead, section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices.

*N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1575 (7th Cir. 1996)(quoting *Seeler v. Trading Port Inc.*, 517 F.2d 33, 38 (2nd Cir. 1975)). In addition, as a result of the Court's injunctive order, Irving will have an opportunity to present its proffered economic hardships to the Union during the collective bargaining process, impressing upon both sides the need for fair and speedy agreement to address the economic issues.

Additionally persuasive regarding the balance of harms, Irving notably has presented no law to support its position that its asserted economic hardships should justify barring injunctive relief to restore the *status quo ante*. While Irving asserts that injunctive relief will cause financial hardship, Irving has not presented evidence that would affirmatively establish that the temporarily-requested actions would jeopardize the financial solvency of Irving. Instead, the more likely result is that Irving may suffer some temporary financial hardship while either Irving awaits a Board ruling relieving Irving of its duties under the collective bargaining agreement or Irving negotiates a more sustainable collective bargaining agreement with the Union. In contrast, not imposing the requested relief causes severe and actualized harm to Irving's employees and to the effectiveness of the Union, due to Irving's potentially unchecked and unilateral avoidance of its duties under the Act. *See e.g. In re Mastronardi Mason Materials Co.*, 336 NLRB at 1308-09 (holding that an employer violated Sections 8(a)(1) and

(5) by unilaterally changes to the conditions of employment and failing to continue the terms and conditions of employment as set forth in an expired collective bargaining agreement); *Engineered Steel Concepts, Inc*, 352 NLRB at 606.

Finally, the Court finds further persuasive the decision of the ALJ to recommend restoration of the terms and conditions of employment to the *status quo ante* in the collective bargaining agreement and to recommend that Irving be ordered to make its employees whole for the unilateral changes enacted by Irving, despite making repeated references to Irving's asserted financial problems. *See* DE 31-2 at 20-21.

Consequently, the balance of harms tips in favor of imposing temporary injunctive relief as requested by the Director.

Accordingly, having considered each of the relevant factors justifying Section 10(j) injunctive relief, the Court now **GRANTS** the Director's motion for temporary injunctive relief. [DE 1].

## C. Scope of Injunctive Relief

When issuing injunctive relief, the Court must state the reasons why an injunction is issued, state the terms of the injunction with specificity, and describe in reasonable detail the act or acts restrained. Fed. R. Civ. P. 65(d). *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 504 (7th Cir. 2008). The scope of injunctive relief is limited to restraining only those acts which are "of the same type or class as [the] unlawful acts which the court has found to have been committed or whose commission in the future[,] unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Id.* (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-37 (1941)). While the Court may not impose broad injunctions "to obey the statute," when an employer is found to have violated labor

laws, the Court has the authority to restrain employers from committing "other related unlawful acts." *Id.* at 506.

All provisions of the Director's requested relief are within the proper scope, as each request is narrowly designed to temporarily remedy the specifically alleged violations of the Act. Further, the requested injunction provisions are comparable to similar provisions imposed by other courts in this Circuit and by the Board. *See generally Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499 (7th Cir. 2008); *Barker ex. rel. N.L.R.B. v. Regal Health and Rehab Center, Inc.*, 632 F.Supp.2d 817, 836 (N.D.Ill. 2009); *Lineback v. Spurlino Materials, LLC*, 2007 WL 3334786, *12 (S.D.Ind. 2007); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 505-07 (7th Cir. 2008) (noting that the language "any like manner" did not exceed the acceptable scope of injunctive relief); *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 858 (S.D.Ind. 1997); *Engineered Steel Concepts, Inc*, 352 NLRB 589, 607 (2008); *In re Mastronardi Mason Materials Co.*, 336 NLRB 1296, 1309-10 (2001); *In re Techno Const. Corp.*, 333 NLRB 75, 85 (2001); *St. John Trucking*, 303 NLRB 723, 731 (1991); *J. P. Sturrus Corp.*, 288 NLRB 668, 673 (1988); *Inland Concrete Enterprises, Inc.*, 225 NLRB 209, 218-19 (1976); *Island Dock Lumber, Inc*., 145 NLRB 484, 493-94 (1963); *Connecticut Sand & Stone Corp*., 138 NLRB 532, 536-37 (1962).

### III.  Conclusion

Accordingly, for the aforementioned reasons, the Court now **GRANTS** the Director's motion for injunctive relief.  [DE 1].  Consequently, this Court **DENIES AS MOOT** the Director's motion for ruling on the administrative record, [DE 3], and Irving's motion for hearing. [DE 23].

Pending ruling on the administrative proceeding before the Board, Irving is **ORDERED** to cease and desist from: (1) withdrawing recognition from the Union as the exclusive collective

bargaining representative for Irving's drivers; (2) directly dealing with Irving's employees regarding wages and other terms and conditions of employment; (3) unilaterally changing the employee's terms and conditions of employment, including wages and overtime benefits; (4) announcing Irving's withdrawal of recognition of the Union to Irving's employees and employment applicants; and (5) interfering with the Section 7 rights of Irving's employees in any like manner.

Additionally, pending ruling on the action before the Board, Irving is **ORDERED** to: (1) recognize, and upon request, bargain collectively with the Union; (2) restore Irving employees' contractual wage and overtime benefits to the *status quo ante*; (3) rescind its June 1, 2010 letter withdrawing recognition of the Union; (4) rescind all written notifications to employees regarding Irving's intention to withdraw recognition of the Union; (5) post copies of this Order at all of Irving's facilities; and (6) file a sworn affidavit of compliance with the Court within twenty days of this Order.

SO ORDERED.

ENTERED: January 28, 2011

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

45